Filed 11/16/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STATE FARM GENERAL INSURANCE COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RICARDO LARA, as Insurance Commissioner, etc.,<br><br>    Defendant and Appellant;<br><br>CONSUMER WATCHDOG,<br><br>    Intervenor and Appellant. | D075529<br><br>(Super. Ct. No. 37-2016-00041469-CU-MC-CTL)<br><br>ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 29, 2021, be modified as follows:

On page 3, in the third paragraph, the final sentence, starting with "We direct" and ending with "respects," is to be deleted and replaced with:

> We direct the superior court to modify the writ of mandate to require the Rate Order be vacated to the extent inconsistent with this opinion, and affirm the judgment and writ of mandate in all other respects.

On pages 58-59, in the paragraph spanning these pages, the final two sentences, starting with "But he does not" and ending with "persuaded," are to be deleted and replaced with:

Remand is unnecessary for this purpose.

On page 59, in the sole full paragraph, the third sentence, starting with "The superior court" and ending with "entirety," is to be deleted and replaced with:

The superior court is directed to enter a new and different judgment: (i) granting SFG's petition for writ of administrative mandate; and (ii) directing the Commissioner to set aside the Rate Order to the extent inconsistent with this opinion.

There is no change in judgment.

The petitions for rehearing are denied.

HUFFMAN, Acting P. J.

Copies to: All parties

2

Filed 10/29/21 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STATE FARM GENERAL INSURANCE COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RICARDO LARA, as Insurance Commissioner, etc.,<br><br>    Defendant and Appellant;<br><br>CONSUMER WATCHDOG,<br><br>    Intervenor and Appellant. | D075529<br><br>(San Diego Super. Ct. No. 37-2016-00041469-CU-MC-CTL) |

APPEALS from a judgment and writ of mandate of the Superior Court of San Diego County, Katherine A. Bacal, Judge. Affirmed in part and reversed in part with directions.

Gibson, Dunn & Crutcher, Theodore J. Boutros, Jr., Kristin A. Linsley, Kahn A. Scolnick; Hogan Lovells, Vanessa O. Wells and Victoria C. Brown for Plaintiff State Farm General Insurance Company.

LevatoLaw and Ronald C. Cohen for California Business Roundtable as Amicus Curiae on behalf of Plaintiff.

California Appellate Law Group, Rex Heinke, Jessica Weisel; Akin Gump Strauss Hauer & Feld and Shawn Hanson for Personal Insurance Federation of California and National Association of Mutual Insurance Companies as Amici Curiae on behalf of Plaintiff.

Xavier Becerra and Rob Bonta, Attorneys General, Diane S. Shaw and Tamar Pachter, Assistant Attorneys General, Molly K. Mosley and Michael Sapoznikow, Deputy Attorneys General, for Defendant Ricardo Lara in his official capacity as Insurance Commissioner of the State of California.

Strumwasser & Woocher, Michael J. Strumwasser, Bryce A. Gee, Caroline C. Chiapetti; Harvey Rosenfield and Pamela Pressley, for Intervenor Consumer Watchdog.

INTRODUCTION

This appeal arises from an application by State Farm General Insurance Company (SFG) to increase its homeowners' insurance rates, under the prior approval system implemented by Proposition 103 (Ins. Code, § 1861.01 et seq.)[1] Nonprofit Consumer Watchdog (CW) intervened in the proceeding, and challenged SFG's proposed rates. Section 1861.05, subdivision (a) (§ 1861.05(a)), requires the Insurance Commissioner to "consider whether the rate mathematically reflects the insurance company's investment income." The Commissioner relied on regulation section 2644.20, addressing projected yield, to use the combined annual statement of SFG's parent company, State Farm Mutual Automobile Insurance Company (State Farm Mutual) and its property-casualty affiliates. The Commissioner ordered SFG to decrease its rate retroactively and issue refunds (Rate Order).

---

[1] Further statutory references are to the Insurance Code unless noted. Regulation references are to the Proposition 103 regulations (Cal. Code Regs., tit. 10, § 2641.1 et seq.), unless noted.

2

SFG filed a petition for writ of mandate. The superior court determined section 1861.05(a) requires the rate to mathematically reflect the applicant insurer's income, and the Commissioner's interpretation and application of regulation section 2644.20 to use the income of SFG's affiliates conflicted with the statute. The court entered judgment for SFG, issued a peremptory writ of mandate requiring the Rate Order be set aside, and remanded remaining issues to the Commissioner, including the propriety of the retroactive rate and refund.

The Commissioner and CW (Appellants) appeal from the judgment and writ of mandate, contending the Commissioner properly interpreted the statute and regulation and had authority to set an earlier effective date and require refunds.[2] SFG cross-appeals from the order directing remand to the Commissioner, which it argues is unnecessary in light of the impropriety of the retroactive rate and refund as well as a subsequent rate change for SFG.

We conclude the superior court correctly determined section 1861.05(a) requires use of the applicant insurer's income, and the Commissioner erred in interpreting and applying Regulation 2644.20 here. We further conclude the retroactive rate and refund were impermissible, and remand is not warranted under the circumstances. We direct the superior court to modify the writ of mandate to require the Rate Order be vacated in its entirety, and affirm the judgment and writ of mandate in all other respects.

---

[2]     For clarity, we generally refer to points made by at least one appellant (the Commissioner or CW) as being by Appellants, and distinguish between them as warranted.

3

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Proposition 103*

Proposition 103 was approved by voters in November 1988, and made "numerous fundamental changes in the regulation of automobile and other types of insurance," including homeowners' insurance and excluding certain lines not at issue here.  (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 812 (*Calfarm*); *id.* at p. 812, fn. 1.)  Previously, insurers set rates in an " 'open competition' system," and rates had increased significantly.  (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 300 (*20th Century*); see Stats. 1988, Prop. 103, uncodified § 1 [Findings & Declaration.].)  Proposition 103 explained its purpose was "to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians."  (Stats. 1988, Prop. 103, uncodified § 2 ["Purpose"]; see also *id.*, uncodified § 8, subd. (a) ["This Act shall be liberally construed and applied in order to fully promote its underlying purposes"].)

With respect to rate setting, Proposition 103 had two main components. First, it imposed a rollback of rates to 20 percent less than their November 1987 levels, for one year after passage (through November 1989).  (§ 1861.01, subd. (a).)  This is sometimes called the "rollback year" or "rollback period." (*20th Century*, *supra*, 8 Cal.4th at pp. 243, 253.)  During this period, insurers could set a different rate to avoid confiscation, subject to Commissioner review and the risk of having to refund amounts in excess of a minimally non-confiscatory rate.  (§ 1861.01, subd. (b); *20th Century*, at p. 254.)  For

4

purposes of this appeal, "confiscatory" can be understood generally to mean "inadequate." (See *Calfarm*, *supra*, 48 Cal.3d at p. 822, fn. 15.)[3]

Second, Proposition 103 implemented a "prior approval" system, which provided that as of November 1989, "insurance rates subject to this chapter must be approved by the commissioner prior to their use." (§ 1861.01, subd. (c).) Section 1861.05(a) addresses approval of rates, and provides:

> "No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income."

The remainder of section 1861.05 sets forth procedural requirements for rate applications (§ 1861.05, subd. (b)) and public notice provisions (§ 1861.05, subds. (c)-(d)).

The California Supreme Court has explained that section 1861.05(a)'s requirement that the Commissioner " 'shall consider whether the rate mathematically reflects the insurance company's investment income' . . . impliedly requires that the commissioner shall offset the latter against the former." (*20th Century*, *supra*, 8 Cal.4th at pp. 290-291.) Insurance companies have two main sources of income: premiums and investments. (See Rejda & McNamara, Principles of Risk Management and Insurance (12th ed. 2014) p. 127; accord, Werner and Modlin, Basic

---

[3] What it means for a rate to be confiscatory in this context has been disputed, including in *20th Century* and this case. (See, e.g., *20th Century*, *supra*, 8 Cal.4th at pp. 262-263; see also *Mercury Casualty Co. v. Jones* (2017) 8 Cal.App.5th 561, 583-584 (*Mercury*).) Because we do not reach the issue here, we need not define the term further.

Ratemaking (5th ed. 2016) p. 5 [describing income sources as "underwriting profit and investment income"].) Thus, Proposition 103 provides for lower premium rates when investment income is high, and higher rates when that income is low. This is consistent with a "total return" ratemaking approach, in which the premium an insurer can charge is a function of other available income sources, thus avoiding an unreasonable rate of return. That said, Proposition 103 did "not establish a detailed method of processing and deciding rate applications," and "[m]uch [was] necessarily left to the [Commissioner] . . . ." (*Calfarm*, *supra*, 48 Cal.3d at p. 824.) The Commissioner promulgated regulations to implement Proposition 103, which we describe shortly.

*Calfarm* and *20th Century* were early and significant decisions regarding Proposition 103, and specifically the rollback period. In *Calfarm*, the California Supreme Court "upheld, inter alia, Proposition 103's provision requiring rate rollbacks." (*20th Century*, *supra*, 8 Cal.4th at p. 240.) A few years later, in *20th Century*, the Court upheld the "implementation of Proposition 103's rate rollback requirement provision by the Insurance Commissioner." (*Ibid.*)

B.      *Regulations*

The regulations contain formulas for determining the "maximum permitted earned premium" and "minimum permitted earned premium" (Reg. §§ 2644.2, 2644.3); these turn in part on "investment income factors" (*Id.*, § 2644.19) and may be subject to variances (*Id.*, § 2644.27). Broadly speaking, investment income is calculated by multiplying projected yield by other figures defined elsewhere in the regulations, regarding reserves, surplus, and federal income taxes. (*Id.*, § 2644.19.)

6

Projected yield is central to this appeal. This factor initially was based on "imbedded yield," calculated using "the insurer's net investment income." (Register 92, No. 3, p. 728.30; Register 92, Nos. 15-17, p. 728.32; Register 95, Nos. 10-11, p. 728.26.) Effective 2007, the regulation was amended as follows:

> " 'Projected yield' means the weighted average yield computed using the insurer's actual portfolio and yields currently available on securities in US capital markets. The weights shall be determined using the insurer's most recent consolidated statutory annual statement, and shall be computed by dividing the insurer's assets in each separate asset class . . . ."

(Register 2007, No. 1; reg. § 2644.20, subd. (a).) A set yield was assigned for each asset class, with bonds having lower yields and stocks having higher ones. (Reg. § 2644.20, subd. (c).)[4]

Reserves are funds for expected liabilities (Werner and Modlin, at p. 317), while surplus is "available capital backing up premiums." (*20th Century*, 8 Cal.4th at pp. 259, 290; see *id.* at p. 290 [surplus may "simultaneously support the insurance business and earn investment income"].) In the regulations, both are based on industry-wide averages. (Reg. § 2644.21 [requiring industry-wide reserve ratios]; *id.*, § 2644.22 [surplus ratio is reciprocal of leverage factor]; *id.*, § 2644.17 [requiring industry-wide leverage factors].) The federal income tax factors are based on tax rates, subject to certain adjustments (including, in part, weighted yield under Reg. § 2644.20). (*Id.*, § 2644.18.)

---

[4] There were later amendments to the yield provisions, but they are not at issue here. (See Register 2008, No. 20; Register 2018, No. 8.)

C.  *The NAIC and Insurer Reporting*

The National Association of Insurance Commissioners (NAIC) is an organization of insurance regulators from each state that identifies best practices and promotes uniformity.  The NAIC has financial statement forms (or "blanks"), instructions, and an Accounting Practices and Procedures Manual for insurer reporting.[5]  Relevant here, there is a blank for a combined annual statement for affiliated property/casualty insurers.  The instructions provide that "[e]very group of affiliated insurers" that meet conditions described therein shall file a combined annual statement with the NAIC Support and Services Offices.  They further indicate the statement's "primary purpose" is "to provide the NAIC database with combined data for each group of affiliated insurers for use by the NAIC in statistical research and analysis."

The Insurance Code requires each insurer doing business in California to file annual and quarterly statements with the Commissioner.  (§ 900.)  They must use the NAIC statement blanks and instructions, and complete them consistent with the NAIC manual, "to the extent . . . not [in] conflict" with code provisions.  (§ 923.)  A separate provision requires insurers to file copies of their annual and quarterly statements with the NAIC.  (§ 931.)

D.  *Background on SFG*

SFG is a wholly-owned subsidiary of State Farm Mutual, which also has seven other property/casualty affiliates.  These entities are sometimes

---

[5]  We grant SFG's request for judicial notice of the NAIC instructions, annual statement blank, and manual in effect when SFG filed its rate application.  (Evid. Code, §§ 452, subd. (h), 459.)

8

described here as "State Farm Group," and most, including SFG, are domiciled in Illinois.[6]

SFG took its current form after 1998, when State Farm began the process of converting SFG to a California-specific company for non-automobile lines, to better manage "the unusual risks presented by California's exposure to catastrophes," while "segregat[ing] [that] exposure" and avoiding "cross-subsidiz[ation]" of California policyholders. As a result, SFG did not renew non-California homeowners' policies, and started offering coverage to California homeowners previously insured by a different State Farm entity. By the time of the rate hearing here, SFG insured approximately 20 percent of California homeowners. State-specific entities were also developed for Florida and Texas, with State Farm Fire and Casualty Insurance Company issuing policies in the remaining states.

SFG has its own board of directors and officers, with those individuals serving other State Farm entities as well. SFG also takes part in shared services agreements for functions including underwriting, collections, and legal, and does not have its own employees. SFG also receives reinsurance protection, a credit line, and coverage of California Earthquake Authority contributions from State Farm Mutual, and participates in a liquidity pool for affiliates that operates like a money market fund.

As for investments, State Farm has an investment department that has stated investment policies, and which develops a specific investment plan for each entity. The investment department recommended a 100 percent bond portfolio for SFG, based on its business needs and exposures, which was submitted to SFG's investment committee and then its board. State Farm

---

[6] We also sometimes use "State Farm," when the record is unclear in distinguishing State Farm Mutual from State Farm Group.

9

Group has a significant stock portfolio, with approximately 40 percent of assets in stocks at the relevant time. Although many large insurers have intercompany pooling agreements, in which premiums and losses are pooled and distributed, SFG has no such arrangement. SFG maintains that it relies on its surplus to meet policyholder needs, and that State Farm Mutual does not have access to it.

SFG files its own annual statement. State Farm Mutual does so as well, and also files a combined annual statement with the NAIC for State Farm Group. The combined statement does not specify which affiliate owns which assets.

E.    *Rate Application and Hearing*

In early 2014, the Commissioner approved a homeowners' insurance rate request submitted by SFG the previous year.[7] That application identified a projected yield of 4.94 percent on $128.8 billion in invested assets. In December 2014, SFG submitted another application to increase rates, by 6.9 percent (later amended to 6.4 percent), effective July 15, 2015. SFG used its individual assets, and identified a projected yield of 2.40 percent on $5.7 billion in invested assets. CW intervened in the proceeding, and argued in part that SFG failed to use data required by regulation section 2644.20, thus understating projected yield and resulting in an excessive rate.[8] On June 22, 2015, the Commissioner issued a Notice of Hearing, which stated in part:

---

[7]    We grant CW's request for judicial notice of SFG's prior rate application. (Evid. Code, §§ 452, subd. (h), 459.)

[8]    Another nonprofit intervenor, Consumer Federation of California, is not a party to this appeal.

10

"[E]ffective July 15, 2015, Applicant must reduce its rates by 6.6 [percent] or any other amount by which they are determined through this proceeding to be excessive. [¶] To the extent Applicant charges excessive rates after July 15, 2015 and before implementing any rate change ordered as a result of this proceeding, Applicant will owe refunds . . . ."

The notice also stated that one of the hearing issues was "if a rate increase is indicated effective July 15, 2015, whether and how much Applicant must pay as refunds and interest . . . between July 15, 2015 and the date Applicant implements the new rate."

An administrative law judge (ALJ) held a lengthy rate proceeding, with written testimony, cross-examination, and exhibits. Witnesses included SFG executives, representatives from the California Department of Insurance (Department), and experts. We described some of the evidence regarding SFG's operations above. Relevant here, a Department witness also acknowledged SFG was not in a pooling arrangement, and that if State Farm Mutual lost money in stocks, it "couldn't just take particular earnings from [SFG's] bonds" to cover its investment losses. The witness did question whether SFG chose its own investments, and opined it did "not seem reasonable that SFG would choose to invest 100 [percent] of its surplus in low-yielding bonds given all of the protection it has from its parent." During the hearing, CW and the Department filed motions to strike portions of SFG's evidence, arguing SFG was improperly seeking to relitigate the regulatory ratemaking formula. The ALJ granted the motions in part, striking evidence "offered for the purpose of using SFG's individual annual statement to calculate Projected Yield." The ALJ did allow certain evidence about SFG's operations because it could be pertinent to a variance issue.

After the hearing, the ALJ issued its decision, which the Commissioner adopted as its Rate Order in November 2016. The order set forth background

11

facts about SFG's operations, including regarding the 1998 reorganization; SFG's participation in shared services and reinsurance arrangements with its affiliates; and State Farm Mutual's purported control of SFG.

The Rate Order required SFG to reduce its rates by seven percent (over 13 percent below the applied-for rate). In reaching this result, the Commissioner determined regulation section 2644.20 required use of the consolidated annual statement filed by State Farm Mutual to calculate SFG's projected yield, and the projected yield was 5.84 percent. He explained the term "mathematically reflects" in section 1861.05(a) "only requires that the calculation . . . be mathematically accurate," and "does not determine which statement will be used when an insurance company is a group." He further explained the industry was largely comprised of national, group insurers; insurers in groups were required to "perform risk management on [a] . . . group basis"; and using consolidated statements was "consistent with the regulatory framework within which insurers may transfer assets between affiliates . . . as State Farm Mutual undoubtedly did when it reconfigured SFG in 1998." The Commissioner found no conflict between "actual portfolio" and "consolidated . . . statement" in the regulation, stating the "consolidated annual statement is [SFG's] actual portfolio on a group basis." He noted the "term[] 'actual portfolio' distinguish[ed] the current definition of projected yield . . . from the previous version which defined the projected yield as an 'imbedded yield.'"

The Commissioner further determined the rate formula "support[ed] [a] . . . decrease . . . retroactive to July 15, 2015." He acknowledged SFG contested retroactive reduction, and explained, inter alia, that "maintaining [the initial effective date] to approve new rates retroactively" serves several purposes, including manageability; using an interim rate and refund were

12

consistent with the Insurance Code and *20th Century*; and the Notice of Hearing had put SFG on notice. SFG represents the refunds totaled about $100 million. The Commissioner also rejected SFG's argument that the rate was confiscatory.[9]

F.  *Superior Court Proceedings*

In November 2016, SFG filed a petition for writ of administrative mandate to the superior court, challenging the use of group data, arguing the rate was confiscatory and raised constitutional concerns, and contending the retroactive rate and refund were impermissible.[10] SFG also sought a stay of the Rate Order pending resolution of the petition. In December 2016, the superior court stayed the refund, but not the rate reduction. SFG reduced its rates, consistent with the Rate Order.

In March 2018, the superior court issued its order, focusing on SFG's position that the Commissioner "improperly attributed income to [SFG] from its affiliate's assets," and its arguments that the new rate was inconsistent with section 1861.05(a) and exceeded the Commissioner's regulatory authority. The court agreed.

The superior court began by describing section 1861.05(a), and noting that, "On its face, the statute says the Commissioner must consider the

_____

[9]     The Commissioner made other determinations which are not at issue here, including as to the leverage factor variance (which SFG challenged in the superior court, but is not pursuing here), and the catastrophe adjustment factor (which SFG did not challenge in the superior court at all). The Commissioner notes these determinations in arguing for a remand, which we address *post*.

[10]    SFG also sought traditional mandate and declaratory and injunctive relief, but the superior court issued a writ of administrative mandate and the parties focus on that aspect of the petition. We do so as well.

13

'insurance company's' investment income." The court then described the Commissioner's reliance on regulation section 2644.20, and the NAIC reporting requirements. The court acknowledged the Commissioner's interpretation is due great weight but found deference was not warranted here:

> "Under section 1861.05, the rate must mathematically reflect State Farm's investment income. Regulation section 2644.20 is consistent with the statute in that it requires the yield to be computed using [SFG's] 'actual portfolio.' . . . The Commissioner's interpretation that the regulation allows him to use [State Farm Mutual]'s group yield instead of [SFG's] investment income based on [SFG's] actual portfolio is inconsistent with the statute. [SFG's] actual portfolio consists almost entirely of bonds. [Citation.] However, the Commissioner used the combined assets for 9 affiliates to come up with a portfolio consisting of about 40 [percent] equities. [Citation.] Consequently, the decision must be set aside."[11]

The superior court also rejected the Commissioner's reliance on other Insurance Code sections to contend the term "company" encompasses affiliates and NAIC's purported definition of a company as "company and its affiliates," explaining in part that there was only one applicant here—SFG.

_____

[11] The superior court observed here that the "regulation requires the Commissioner to use [SFG's] consolidated annual statement, but in this instance [SFG's] figures are included in [State Farm Mutual]'s statement because of NAIC's rules" and "the NAIC does not allow [SFG] to file its own annual statement." Appellants criticize this finding as inaccurate, and assert other ways in which the court purportedly was confused. Viewed in context, the court may have meant SFG does not file a *consolidated* statement under NAIC rules. Regardless, any error here is immaterial; as discussed *post*, the appeal focuses on statutory and regulatory interpretation and we apply de novo review. (Cf. *Mercury*, *supra*, 8 Cal.App.5th at p. 584 ["any error the superior court might have made," in improperly deferring to Commissioner's interpretation, "was necessarily harmless"].)

14

The court did not reach other issues raised by the parties, including the retroactive rate and refund, rejected SFG's argument that the ALJ improperly excluded certain evidence, and remanded for further proceedings.

In February 2019, the court entered judgment for SFG and issued a peremptory writ of mandate, requiring the Commissioner to set aside the Rate Order to the extent inconsistent with its March 2018 order and reconsider remanded issues. The Commissioner and CW appealed from the judgment and writ of mandate, and SFG appealed from the ruling directing remand to the Commissioner. The California Business Roundtable, Personal Insurance Federation of California, and National Association of Mutual Insurance Companies applied to file amicus curiae briefs on behalf of SFG. We granted the applications, and the parties filed responsive briefs.

DISCUSSION

I.    *Appeal From Judgment*

Appellants argue section 1861.05(a) permits use of group income, the Commissioner properly interpreted and applied regulation section 2644.20, and the rate effective date and refund were proper. They also disagree with SFG's arguments for affirmance that the Rate Order was confiscatory and otherwise unconstitutional. We reject Appellants' arguments regarding the statute and regulation, address the retroactive rate and refund in connection with SFG's cross-appeal and conclude they were improper, and need not and do not address confiscation or constitutionality.

A.    *Applicable Law*

1.    *Statutory and Regulatory Interpretation*

" 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] 'In determining such intent, a court must look first to the words of the statute

15

themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.' [Citation.] At the same time, 'we do not consider . . . statutory language in isolation.' [Citation.] Instead, we 'examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts.' [Citation.] Moreover, we ' "read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 (*Garamendi*).)

"If the statutory language is clear and unambiguous, then we need go no further. [Citation.] If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)

"The rules governing interpretation of statutes generally apply also to initiatives and regulations." (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214 (*Spanish Speaking Citizens*); see, e.g., *Silva v. Humboldt* (2021) 62 Cal.App.5th 928, 934 [if language is not ambiguous, we presume "voters intended the meaning apparent from that language," and "may not add to the statute or rewrite it to conform to some assumed intent"].) A regulation also "must fit 'within the scope of authority conferred' by the Legislature." (*Association of California Ins. Cos. v. Jones* (2017) 2 Cal.5th 376, 390 (*ASIC*); *ibid.* ["[r]egulations that alter or amend the statute, or enlarge or impair its scope, are invalid"]; see *In re Gadlin* (2020)

16

10 Cal.5th 915, 926 [regulations must be " 'consistent and not in conflict with' " statute]; *Assoc. of Cal. Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1044 (*Poizner*) [accord].)

Courts take "ultimate responsibility for the construction of the statute," while according "great weight and respect to the administrative construction." (*Yamaha Corp. of America v. State Bd. Of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*).) We discuss deference in more detail while addressing the parties' arguments *post*.

2.      *Standard of Review*

The superior court applies independent judgment review to a rate order. (§ 1858.6; see *Poizner*, *supra*, 180 Cal.App.4th at p. 1045 [independent judgment standard requires " 'strong presumption of correctness to the Commissioner's findings . . . but ultimately the trial court is free to reweigh the evidence' "]; see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [where trial court applies independent judgment review, reviewing court applies substantial evidence review to factual findings]; *20th Century*, *supra*, 8 Cal.4th at p. 271 [independent review applies to questions of law and mixed questions of law and fact that are predominantly legal].)

"Interpretation of a statute or regulation is, of course, an issue of law for the court [citations], as is the question whether a regulation is consistent with the authorizing statute [citation]. Thus, we must review the interpretations of the [agency] and the trial court de novo, and come to our own independent conclusions on these issues." (*Spanish Speaking Citizens*, *supra*, 85 Cal.App.4th at p. 1214; see *Mercury*, *supra*, 8 Cal.App.5th at p. 584 ["Engaging in our own independent judicial review, as we must, we will not defer to either the commissioner or the superior court"].)

17

B.    *Section 1861.05(a)*

    1.    *Statutory Language*

We begin with the central statutory interpretation issue here: what it means to "consider whether the rate mathematically reflects the insurance company's investment income." (§ 1861.05(a).)

Appellants argue this language is an "open-ended provision that must be implemented through regulations," which does not dictate "how investment income is to be projected" and simply requires its consideration. SFG contends the phrase means "the proposed rate must be adjusted by the applicant's projected investment income to meet the premium need—a straightforward mathematical offset," and the Commissioner cannot "disregard the mathematical correlation of the rate to the insurance company's investment income . . . ." We conclude "consider" cannot be read in isolation, and when we view it alongside "mathematically reflects" and "insurance company[]"—as we must—the only reasonable interpretation is that urged by SFG. As we shall explain, the statute requires the Commissioner to use the actual projected investment income of the applicant insurer.

        a.    *"Consider"*

"To 'consider' means to 'think about carefully' or to 'take into account.' " (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 386 (*Plantier*), citing Webster's 9th New Collegiate Dict. (1987) pp. 279-280; accord, Merriam-Webster's Collegiate Dict. 11th Ed. (2019) pp. 265-266 (Webster's Dict.).) Viewed alone, "consider" could imply a range of levels of review, from mere contemplation to full incorporation. But "consider" is not alone here; it is part of a directive that also requires "mathematical[] reflect[ion]" for an "insurance company[]." Interpreting "consider" here to

18

mean any level of review, as Appellants contend, would render those words surplusage. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 (*Briggs*) [" ' "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." ' "]; *Garamendi, supra*, 32 Cal.4th at p. 1045 [" 'An interpretation that renders statutory language a nullity is obviously to be avoided.' "].)

The case law supports this interpretation. As noted *ante*, the California Supreme Court has observed that section 1861.05(a) "impliedly requires that the commissioner shall offset" investment income against the rate. (*20th Century, supra*, 8 Cal.4th at p. 290.) Mere review, or really anything less than substantive incorporation, of the applicant's investment income is inconsistent with such an offset. Courts in other contexts have concluded the word "consider" requires substantive incorporation, as well. (See, e.g., *Plantier, supra*, 7 Cal.5th at pp. 381, 386 [where proposition barred local agency from imposing property-related fee " '[i]f written protests . . . are presented by a majority of owners,' " thus requiring it to count all written protests, requirement to also " 'consider all protests' " had to "mean more than simply counting" them and required "tak[ing] [them] into account when deciding whether to approve the proposed fee"]; *MK Hillside Partners v. Comm'r of Internal Revenue* (9th Cir. 2016) 826 F.3d 1200, 1205 [disagreeing that statute granting tax court "jurisdiction to consider" statute of limitations argument by partner did not permit determination of issue; "it is unlikely that Congress enacted '[the statute] to enable a partner to raise an argument pertaining to timeliness about which the Tax Court may only ruminate' "].)

Accordingly, we reject the Commissioner's contention that the only constraint under section 1861.05(a) is that "no consideration shall be given to

the degree of competition." Just as "consider[]" imposes a mandatory limit on using market competition, so too does "consider" impose a mandatory obligation to use the insurance company's investment income. (See *People v. Blackburn* (2015) 61 Cal.4th 1113, 1125 [" 'it is generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute' "]; see *Chandis Securities Co. v. City of Dana Point* (1996) 52 Cal.App.4th 475, 486 [accord].)

We also disagree with CW that "consider whether" implies a " 'yes' or 'no' answer," such that the Commissioner just needs to affirm he considered investment income, and that SFG's interpretation ignores the word "whether." Viewed in context, "consider whether" reasonably reflects the Commissioner is reviewing a proposed rate, not setting it. (§ 1861.05(a) ["[n]o rate shall be approved . . . ."]; *20th Century*, *supra*, 8 Cal.4th at pp. 284-285 [under Prop. 103, Commissioner does not set rates, but rather "determines the rate . . . that the individual insurer may itself set"].) This is also consistent with section 1861.05(a) as a whole. It is in "considering whether a rate is excessive, inadequate or unfairly discriminatory" that the Commissioner is considering investment income. (§ 1861.05(a).) That language likewise reflects the Commissioner is reviewing a proposed rate, and, at least for excessive or inadequate rates, does not call for a yes or no answer. Indeed, the Rate Order did not just state SFG's rate was excessive; it identified a purported percentage amount by which it had to be reduced.

b. *"Mathematically Reflects"*

We turn next to "mathematically reflects." "Mathematically" means "rigorously exact: precise, certain," while "reflect" in this context means to "make manifest or apparent" and to "mirror." (Webster's Dict., at pp. 765,

20

1046.) Viewed together and in context, these words mean the rate must correlate to the insurance company's actual projected investment income— meaning, in turn, the Commissioner must use data capturing that income in his review. This reading is consistent with the "excessive" and "inadequate" language in section 1861.05(a), which implies there are set higher and lower limits. (See *20th Century*, *supra*, 8 Cal.4th at p. 285 [under prior approval system, "ratemaking formula is used to fix . . . the range of rates within the bounds of the 'excessive' and the 'inadequate' "].) Interpreting the statute to require use of the insurer's actual projected investment income ensures the approved rate falls within the acceptable range. Permitting use of data that may simply relate to the insurer—such as aggregate data with affiliates that do not share assets—could lead to rates outside that range.

Appellants' arguments do not compel a different result. First, they contend the term "mathematical" does not preclude generic calculations. They explain some rate review factors already utilize industry-wide data and other non-company specific information, citing the generic calculations used for different asset classes in regulation section 2644.20 and certain investment income factors, like the leverage factor underlying the surplus ratio factor and the tax factors. (See Reg. §§ 2644.20, subds. (b)-(c), 2644.17-2644.19, 2644.22; see descriptions *ante*.) Although a generic calculation may suffice for certain aspects of the rate determination, it does not follow that it will be adequate for a factor that purports to capture the insurer's actual portfolio, like projected yield. Nor is a generic calculation even at issue. Indeed, it is *because* projected yield varies based on the portfolio at issue that using group-level data can result in a different amount of investment income.

Second, CW focuses on the Commissioner's role in administering section 1861.05(a), arguing the phrase "mathematically reflects" is unusual

21

and the statute does not dictate how to apply it, whereas the Commissioner has discretion as to what to include in investment income. The Commissioner himself elsewhere emphasizes his "broad authority" to "use . . . many different kinds of data . . . ." But the words "mathematically reflect[]" have meaning, regardless of being uncommon or undefined in the statute, and the Commissioner's discretion is limited by the statutory text. (*Yamaha*, *supra*, 19 Cal.4th at pp. 10-11.) CW again attempts to rely on *20th Century*, citing its determination that it was not "improper for the rate regulations as to rollbacks to take account of investment income on capital used and useful for providing insurance." (*20th Century*, *supra*, 8 Cal.4th at p. 290.) The California Supreme Court was addressing the exclusion of "surplus surplus," or surplus beyond what is used and useful to back up premiums, not the Commissioner's discretion generally. (*Id.* at pp. 290-291.) And the fact that the Commissioner's treatment of surplus in the rollback regulations may have been within his discretion does not imply his treatment of projected yield in a prior approval hearing regarding SFG is as well.[12]

   c.  *"Insurance Company"*

We agree with the superior court that, on its face, section 1861.05(a) requires the Commissioner to use "the *insurance company's* investment income," not that of the company and its affiliates. (Emphasis added.) This interpretation is consistent with the precision implied by the preceding

_____

[12] Along similar lines, we reject the Commissioner's contention that SFG's " 'actual' reported investment income" would include "surplus surplus," its exclusion benefits SFG, and this shows the "dangers" of focusing on rate components. It may well be that the Commissioner's treatment of "surplus surplus" in the prior approval system is within his discretion too, but this still has no bearing on whether his calculation of projected yield is consistent with the statute.

phrase, "mathematically reflects." It is also consistent with section 1861.05, subdivisions (b)-(d), which contain the procedural requirements for rate approval and repeatedly refer to the "insurer" and/or "applicant," without reference to affiliates. (See § 1861.05, subd. (b) ["[e]very insurer which desires to change any rate shall file a complete rate application," with certain specified data; placing burden on "applicant" to show rate is justified]; *id.*, subd. (c) [Commissioner "shall notify the public of any application by an insurer for a rate change"]; *id.*, subd. (d)(2) ["extraordinary circumstances" for notice provisions include applications not resolved within deemed-approved 180-day period, due to judicial proceeding involving application and "initiated by the applicant or an intervenor"].)[13]

Appellants' arguments are unavailing. First, they contend "company" is used broadly in the Insurance Code to include affiliates, citing a general provision addressing singular and plural references (§ 13); sections governing insurer examinations (§ 729, et seq.), and their purported incorporation by reference into Proposition 103; and reporting provisions (§§ 900, 923-924, 935.4), including those referencing NAIC materials that they claim define "company" to include affiliates. They also cite a section allowing commonly-owned insurers to act as a single insurer (§ 1853.5). We address each in turn, and conclude none of these sections support Appellants' interpretation.

---

[13] In addressing required application data, section 1861.05, subdivision (b) cites three other sections, but they have no bearing here. (§§ 1857.7, 1857.9, 1864; § 1857.15 is also cited, but has been repealed.) None address affiliates, and the only mention of groups is in section 1857.9, a reporting provision that permits aggregate reports and incorporates by reference a statute requiring joint records in certain cases. (§ 1857.9, subds. (e), (j) [insurer can meet obligation consistent with § 1857, which requires reasonable records be maintained by insurer groups "engag[ing] in joint underwriting or joint reinsurance"].)

23

Section 13 states "[t]he singular number includes the plural . . . ." However, the section is a general provision under the Insurance Code, and the general provisions apply "[u]nless the context otherwise requires . . . ." (§ 5.) Even if "plural" could be construed to encompass "affiliates," section 1861.05(a) would still require "insurance company" to mean the applicant insurer, for the reasons discussed *ante*. (Cf. *People v. Kunitz* (2004) 122 Cal.App.4th 652, 655-656 ["language and structure" of statute at issue indicated general rule that " 'singular . . . includes the plural' " was "not intended to apply"].)

Sections 729, et seq. contains provisions for Commissioner examinations. (§ 729 [definitions]; § 730 [authorizing Commissioner to conduct examinations, and generally requiring them every five years].) Section 729 defines terms "[a]s used in this article," and states in part that " '[c]ompany' means any person engaging in . . . any . . . kind of insurance . . . business and any person or group of persons who may otherwise be subject to the . . . authority of the commissioner." (§ 729, subd. (a).) It is in a different chapter and article from section 1861.05. (Compare § 729 [Division I, Part 2, Ch. 1, Art. 4], with § 1861.05 [Division I, Part 2, Ch. 9, Art. 10].) Section 1860.3 does incorporate section 730, the substantive examination provisions, into the chapter in which Proposition 103 is codified (Ch. 9, Rates and Rating and other Organizations). But in addition to not actually incorporating section 729, section 1860.3 was enacted decades prior to Proposition 103 and the specific language of section 1861.05 would take precedence regardless. (§ 1860.3; added by Stats. 1947, ch. 805, p. 1907, § 1, amended by Stats. 1955, ch. 677, p. 1168, § 1; see *State Dept. of Public Health v. Sup. Ct.* (*Ctr. for Investigative Reporting*) (2015) 60 Cal.4th 940, 955 (*Ctr. for Investigative Reporting*) [" 'If conflicting statutes cannot be reconciled, later enactments

24

supersede earlier ones [citation], and more specific provisions take precedence over more general ones [citation].' "]; Code Civ. Proc., § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"].)

As for the reporting provisions, the financial statement requirements do not define insurer, or require insurers to include affiliate assets. (§ 900, et seq.) Nor do the NAIC materials establish otherwise, regardless of their required use under section 923. The NAIC instructions for the combined annual statement indicate that "wherever the word 'company' appears in the blank, it should be construed to mean 'company and its affiliates' "—meaning, unsurprisingly, that in a form for combined reporting, company refers to the group. This provision has no bearing on the meaning of "insurance company" in section 1861.05(a). The own risk and solvency assessment (ORSA) rules (§ 935.1, et seq.) do have a definition section, but both that section and the substantive provisions separately address the "insurance group" and "insurer," undermining any argument that the terms "insurer" or "insurance company" always imply affiliates as well. (See § 935.2, subds. (a)-(b) [defining "insurance group" and "insurer" by reference to § 1215, subds. (e) and (f) respectively]; § 1215, subds. (e), (f) [defining terms separately, and not defining insurer to include group]; § 935.4 ["an insurer, or the insurance group of which the insurer is a member, shall regularly conduct an ORSA"].)

Section 1853.5 is of no aid to Appellants either. It provides "insurers having a common ownership . . . are hereby authorized to act in concert . . . as if they constituted a single insurer," for purposes including ratemaking. The section *allows* insurers under common ownership to approach ratemaking as a group, but does not require this—much less support a presumption under the later-enacted, and more specific, section 1861.05 that will be treated as if

25

they did so.  (Cf. *Ctr. for Investigative Reporting*, *supra*, 60 Cal.4th at p. 960 ["later enactments supersede earlier ones"]; *ibid.* [specific statutes trump general ones].)

Second, the Commissioner argues the California Supreme Court "upheld an enterprise-wide approach to . . . determining whether rates are confiscatory," and Appellants note the Court stated the confiscation analysis "may implicate formulaic ratemaking [citation] using data reflecting the condition and performance of a group of regulated firms."  (*20th Century*, *supra*, 8 Cal.4th at pp. 258, 293.)  The Commissioner contends these methods are "equally acceptable for . . . calculating investment income."  We disagree. For one thing, the reference to an "enterprise-wide approach" was to the "regulated firm," as distinguished from specific insurance lines.  (See *Id.* at p. 258 [confiscation " 'is an enterprise-wide issue, not one to be parsed on a line-by-line basis' "]; *id.* at p. 293 ["confiscation is judged with an eye toward the regulated firm as an enterprise"].)  More generally, even if enterprise- or group-wide approaches were "equally acceptable" for calculating investment income, this still would not aid Appellants.  SFG does not contest the use of group-wide data, per se.  Rather, they dispute it can be used for an insurer that does not share income with its group, an issue *20th Century* did not address.  (See *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043 ["cases are not authority for propositions that are not considered"].)

In sum, the text of section 1861.05(a) requires the Commissioner to use the applicant insurer's actual projected investment income, precluding the use of group data that does not reflect such income.

## 2. *Statutory Scheme*

This interpretation is consistent with the broader statutory scheme. SFG and CW agree, and the Commissioner does not dispute, that the scheme implements a "total return" approach to ratemaking. As noted *ante*, the total return approach contemplates that if an insurer can earn profit from sources other than premiums—like investments—the premium that it can charge should be reduced. In turn, using the applicant insurer's actual investment portfolio in the ratemaking process ensures that the income credited to the insurer for purposes of this offset is actually available to it, thus avoiding arbitrarily high or low rates.

Accordingly, we disagree with CW that imposing requirements on the Commissioner's consideration of investment income is inconsistent with the statutory scheme. Specifically, CW argues there is no "right way" to get "actual" numbers, as ratemaking is "inherently prospective" and "necessarily encompasses a normative dimension . . . ." Thus, CW posits, the question is not whether the Commissioner used the "actual" number for SFG's future investment income, but whether he "selected from among the alternatives a reasonable way to reflect SFG's future investment income . . . ." We disagree. There is no dispute prior approval ratemaking is prospective or that the Commissioner has discretion in administering the process, but he must do so within the limits of the statute. (*ASIC*, *supra*, 2 Cal.5th at p. 390; *Poizner*, *supra*, 180 Cal.App.4th at p. 1048.) And the statute requires him to use the insurer's actual projected investment income—not to "select[] from among . . . [reasonable] alternatives."[14]

---

[14] CW also asserts here that ratemaking "requires allocation of nationwide data to specific jurisdictions and lines of business." To the extent CW suggests the statutory scheme *requires* the Commissioner to use group-

27

### 3.    *Statutory Purposes*

Requiring use of the insurer's actual projected investment income is also consistent with the purposes of Proposition 103.

As noted *ante*, the initiative's stated purpose is to "protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians." (Stats. 1988, § 2, p. A-276.)  Thus, the objective is not just to keep insurance rates fair to consumers, but also to keep insurance *available*—which requires that rates be fair to the insurers as well.  (See *20th Century*, *supra*, 8 Cal.4th at p. 300 ["ultimate goal is the guaranty that 'insurance is fair, available, and affordable for all Californians' "]; *Spanish Speaking Citizens*, *supra*, 85 Cal.App.4th at p. 1226 ["We can conceive of no interpretation of 'arbitrary insurance rates' . . . as anything other than rates which do not reflect the cost of providing insurance"]; cf. *Calfarm*, *supra*, 48 Cal.3d at p. 821 ["[o]ver the long term the state must permit insurers a fair return"].)  In contrast, SFG and amicus California Business Roundtable suggest imputing high-yield income to insurers with prudent investment strategies would impose an artificial price cap on rates, which could disincentivize such strategies and/or lead them to exit the market—thus limiting availability, to the detriment of consumers.

Further, Proposition 103's focus on fairness to both consumers and insurers is reflected in section 1861.05(a), itself, which bars both excessive *and* inadequate rates.  (*20th Century*, *supra*, 8 Cal.4th at pp. 244-245 [§ 1861.05(a)'s "general standard" for rates that are not "excessive,

---

level data, this is inconsistent with its argument that the scheme leaves him free to exercise his discretion and is no more persuasive.

inadequate, [or] unfairly discriminatory" requires "fair and reasonable rates," and the "range of fair and reasonable rates is defined in light of the insurer's legitimate interest in financial integrity and the insured's legitimate interest in freedom from exploitation"].)

We therefore disagree with Appellants to the extent they suggest the goal of Proposition 103 was only to lower rates and prevent insurers from artificially raising them. Two related points also lack merit. Appellants contend Proposition 103 calls for liberal construal to promote its underlying purposes. (Prop. 103, § 8, subd. (a).) True, but those purposes extend beyond low rates. We also are not persuaded by CW's argument that "[f]orcing consumers to pay excessive rates would frustrate the purpose of protecting consumers from arbitrary insurance rates." The argument assumes SFG's interpretation results in an excessive rate, which Appellants have not established.

4. *Historical Context*

Finally, CW contends the historical context supports Appellants' position. CW explains it was an open question before Proposition 103 was enacted whether investment income would even be considered in setting rates, and that contemporaneous materials, including a NAIC report and a legislative report, reflect such consideration would be flexible. CW seeks judicial notice of these reports.

Historical context can be relevant to statutory interpretation (*Spanish Speaking Citizens*, *supra*, 85 Cal.App.4th at p. 1214), but CW does not establish it sheds any light here. Even if CW were correct that the historical materials support flexibility in ratemaking *generally*, section 1861.05(a) uses specific language. It is the meaning of that language that is before us.

29

In turn, we decline to take judicial notice of the reports, as they are not relevant to disposition of this appeal. (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 59, fn. 7 [denying judicial notice of irrelevant material].) Additionally, there is no indication the voters were presented with these reports, or even their subject matter. The ballot pamphlet, which is in the record, focused on reducing rates and imposing regulations—not ratemaking methodology. (See *20th Century, supra*, 8 Cal.4th at pp. 269-270, fn. 8 [denying notice of flyers "purportedly" distributed to voters during Proposition 103 campaign, because party failed to persuade court that contents may be noticed]; cf. *Legislature v. Eu* (1991) 54 Cal.3d 492, 504-505 [appropriate to consider ballot pamphlets presented to voters in determining meaning of proposition].)

C.    *Regulation section 2644.20*

We now turn to the heart of this matter: whether the Commissioner's interpretation and application of regulation section 2644.20 in SFG's rate hearing was consistent with section 1861.05(a). We conclude it was not. We also reject Appellants' arguments that the Commissioner's interpretation of the regulation satisfies various objectives under Proposition 103 or warrants deference.

1.    *Regulation Language and Application*

Regulation section 2644.20, subdivision (a) states projected yield means the "weighted average yield . . . using the insurer's actual portfolio," and that the "weights shall be determined using the insurer's most recent consolidated statutory annual statement." Appellants maintain this language unambiguously and properly requires the Commissioner to use State Farm Group's combined statement for SFG rate proceedings. SFG contends this interpretation and application of the regulation is internally inconsistent, as

30

there is no consolidated statement for SFG that reflects its actual portfolio, and that using the group's statement violates section 1861.05(a)'s requirement that the rate reflect SFG's investment income. We agree with SFG.

We begin with the regulation language, and conclude it does not neatly apply to an insurer that either does not participate in a group, or does, but without pooling assets or income with other group members. "Actual" means "existing in fact or reality," or "existing . . . at the time." (Webster's Dict., at p. 13.) "Portfolio," in, this context, refers to "[t]he various securities or other investments held by an investor at any given time." (Black's Law Dictionary (9th ed. 2009) p. 1280; Webster's Dict., at p. 967 [accord].) Thus, an insurer's "actual portfolio" is the set of investments held by the insurer at that time. As for the phrase "consolidated statutory annual statement," the statute only requires annual financial statements (§ 900); the combined group statement is a NAIC filing. For an insurer that pools assets within a group, the combined statement arguably could serve as a "consolidated statutory annual statement," and it could reflect its actual portfolio. However, an insurer that does not pool assets, like SFG, does not have a "consolidated statutory annual statement" in any meaningful sense, and any group statement in which it participates reflects only the *group's* portfolio—not its actual portfolio.

Accordingly, in applying regulation section 2644.20 to an insurer like SFG, there are two options: (i) capture SFG's actual portfolio by using its individual statement, and forego using a combined statement; or (ii) use State Farm Group's combined annual statement and forego reflecting SFG's actual portfolio. This brings us back to the statute, because only the first interpretation is consistent with section 1861.05(a). As discussed *ante*, the statute requires the Commissioner to use the *insurance company's* actual

31

projected investment income, not some approximation thereof. (See *ASIC*, *supra*, 2 Cal.5th at p. 390 [regulation must fit within statutory authority]; *Poizner*, *supra*, 180 Cal.App.4th at p. 1044 [accord].) The need to focus on the applicant insurer is particularly evident here, where the insurer and group have different asset portfolios, and asset distribution drives the projected yield calculation. (Reg. § 2644.20, subd. (a).) Accordingly, the Commissioner's use of State Farm Group's combined annual statement to calculate SFG's projected yield violates section 1861.05(a).

The Commissioner's arguments to the contrary lack force. In the Rate Order, he found "no conflict between the terms 'insurer's actual portfolio' and 'consolidated statutory annual statement' because Applicant's consolidated annual statement is Applicant's actual portfolio on a group basis." CW echoes this argument here. But the regulation calls for the "insurer's *actual portfolio*," not the "insurer's actual portfolio on a group basis." (Reg. § 2644.20.) And, regardless, the statute still requires the rate to "mathematically reflect[]" the "insurance company's investment income"—not that of the insurance company and its affiliates. (§ 1861.05(a).)

The Commissioner further contends here that the regulation "defines 'actual portfolio' to mean the investments reported in the 'insurer's consolidated annual statement,' " noting the term "actual portfolio" does not appear in Proposition 103. But statutory interpretation aims to avoid rendering any words meaningless (*Briggs*, *supra*, 19 Cal.4th at p. 1118), and regardless of whether "actual portfolio" appears in the statute, the words have meaning. The Commissioner's argument would render "actual portfolio" a nullity for insurers like SFG that lack a combined statement—and effectively leave him free to simply choose a statement for this purpose, which remains inconsistent with the statute. (Cf. *State Farm Mut. Auto. Ins.*

*Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 77 (*Quackenbush*) ["The Commissioner goes too far, however, when he asserts that 'actual data' means 'the right number,' which allows him to judge whether the insurer used 'a correct process' when it determined its 1989 [allocated loss adjustment expenses] reserves. By no stretch can 'actual' be understood to mean 'correctly determined.' "].)[15]

SFG contends, and we agree, that the Commissioner's interpretation is further undermined by his use of individual statements for insurers operating outside of groups.[16] The Commissioner acknowledges he "has interpreted Regulation 2644.20 to permit the small minority of insurers that do not belong to a group to submit data from the only NAIC financial statements that include their data—their individual financial statements." His explanation is that the truly individual insurers comprise a small part of the market; SFG is unique among large insurers for not pooling assets, and basically wants an exception; and he could reasonably draw the line for group data based on entities filing NAIC combined statements. This explanation turns not on the statutory or regulatory text, but on policy reasons for treating certain insurers differently, and lacks merit regardless. At the relevant time, SFG insured 20 percent of California homeowners, or one-fifth of the market. State Farm may have been the only large insurer not pooling

---

[15] CW suggests SFG is feigning confusion about what "consolidated statutory annual statement" refers to, noting it used group data in its prior rate application in 2013. Our understanding is that SFG disagrees with the Commissioner's interpretation, not that it is confused by it, and Appellants do not establish any prior acquiescence by SFG is relevant.

[16] The individual insurers at the relevant time were Century National, Wawanesa, Golden Bear, Armed Forces Insurance Exchange, and California Mutual Insurance Company.

assets, but the Commissioner's claim that SFG's argument "does not apply to most of the industry" is somewhat misleading. The insurers not sharing assets *do* collectively comprise a large portion of the market.

Appellants' remaining arguments here lack merit. First, they dispute the relevance of the lack of a pooling arrangement. They argue SFG is controlled by State Farm Mutual, and State Farm investments are under common control. They also argue transactions between entities are permitted subject to "regulatory formalities" that amount to reporting requirements, citing section 1215.5, with CW even claiming State Farm Mutual "can, with a little paperwork, always change the corporate structures . . . ." And, they contend, State Farm's investment managers can rebalance assets on the open market, regardless.[17]

These arguments ignore corporate formalities and amount to speculation. (Cf. *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 [corporate form "will be disregarded only in narrowly defined circumstances and only when the ends of justice so require"]; *Flocco v. State Farm Mut. Auto. Ins. Co.* (D.C.App.2000) 752 A.2d 147, 155 [rejecting arguments that "State Farm Mutual and State Farm Fire [were] one and the same" and

---

[17]     This is an appropriate juncture to address the record. SFG offered testimony about its structure and operations, some of which CW and the Department successfully excluded on relevance grounds. Some facts still came in, including through their own witnesses, and the Rate Order discussed them. Appellants cite some of this evidence to dispute SFG's independent existence, while maintaining similar evidence proffered by SFG to illustrate that independence was properly excluded by the ALJ. Although we decline to reach SFG's summary assertion that such exclusion was erroneous, we find Appellants' approach to the evidence in this appeal unhelpful. To the extent facts are in the record, we consider them for all purposes.

challenging "separate corporate existence" of latter; noting status as wholly owned subsidiary did "not provide a sufficient basis for such a finding"].) State Farm assists with investment planning, but it is SFG's investment committee that reviews the plan and its board that approves it. Appellants identify no affiliate transactions, "change[s] [to] the corporate structures," or even "rebalanc[ing]," since SFG's reorganization in 1998 to reflect intermingling of assets.

Nor do Appellants accurately characterize affiliate transactions (much less corporate reorganizations, which typically require more than "a little paperwork"). Far from mere reporting requirements, the law imposes guidelines on such transactions and permits disapproval by the Commissioner; similar laws apply in Illinois, where SFG is domiciled. (See *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 126 [§ 1215.5 provides "terms of transactions by insurers with their affiliates must be 'fair and reasonable,' . . . an insurer must notify the commissioner before entering into certain types of transactions, and . . . the commissioner may disapprove the transaction"]; cf. 215 ILCS 5/131.20 [standards for affiliate transactions]; 215 ILCS 5/131.20a [notification and disapproval provisions].)

Second, Appellants argue SFG's focus on projected yield runs afoul of regulation section 2646.4, subdivision (c), which they contend prohibits "piecemeal relitigation of the regulatory formula" in a rate hearing. Regulation section 2646.4, subdivision (c) bars "[r]elitigation . . . of a matter already determined either by these regulations or by a generic determination"; it permits evidence "relevant to . . . whether the rate is excessive or inadequate," so long as not offered to relitigate the prohibited matters. (Cf. *20th Century*, *supra*, 8 Cal.4th at p. 312 [effect of relitigation

bar is "simply to assure . . . the [ALJ] does not entertain the question whether the premises underlying the rate regulations as to rollbacks are sound"].) SFG does not dispute the validity of regulation section 2644.20, but rather, whether its application here was inconsistent with section 1861.05—a matter not resolved by the regulatory text and not involving a generic determination. Further, the dispute turns on statutory and regulatory interpretation, not obscure regulatory calculations beyond our purview, as Appellants suggest. (Compare *20th Century*, at p. 293 [observing " 'economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result' "].)  Indeed, the Rate Order itself suggests there are just two possible outcomes:  a lower yield and higher maximum rate, using the numbers in SFG's statement, or a higher yield and lower maximum rate, using State Farm Group's combined statement.

Finally, we disagree with the Commissioner that affirming the judgment effectively invalidates regulation section 2644.20.  The superior court determined the regulation's use of the insurer's actual portfolio was consistent with the statute; it was the Commissioner's "interpretation that the regulation allows him to use [State Farm Mutual's] group yield instead of [SFG's] investment income based on [SFG's] actual portfolio" that was inconsistent.  Accordingly, the judgment does not bar the Commissioner from continuing to use a combined annual statement for insurers that pool assets, which SFG concedes may comprise some of the market.  And, of course, the Commissioner already uses individual statements for insurers without affiliates.

2.    *Regulatory Purposes*

Appellants contend that use of group-level data under regulation section 2644.20 advances the purposes of Proposition 103 by limiting rate

36

manipulation, ensuring accuracy, and improving manageability.  Both the premises of this argument and its particulars lack merit with respect to SFG.

As an initial matter, the purported objectives identified by Appellants rest on a statutory meaning and purpose we have rejected:  that section 1861.05(a) permits use of group-level data for insurers who do not pool assets and Proposition 103 was meant solely to keep rates low for consumers. Viewing such data as valid and necessary is a predicate to Appellants' concerns that groups may be engaging in rate manipulation, group data is always necessary to achieve accurate results, and capture of group data should be manageable.  However laudable the Commissioner's goals in trying to capture group-wide data, they cannot supplant the statutory meaning. (See, e.g., *FDA v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120, 161 ["no matter how 'important, conspicuous, and controversial' the issue, . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from [the legislature]"].)

Appellants' specific contentions also lack force.

First, Appellants contend rate manipulation is a problem, explaining multi-state insurers have the incentive and the means to avoid recognition of investment income, such as by "artificially rais[ing] rates [through] altering corporate structures and investment holdings."  In turn, they contend, using group-level data reduces rate manipulation opportunities, consistent with the purposes of Proposition 103.

These contentions resemble their claims about SFG's purported lack of independence, and likewise amount to speculation.  In essence, their position appears to be that any insurer group not openly sharing assets is doing so for nefarious purposes.  For example, CW cites the Rate Order finding that insurers "may transfer assets between affiliates . . . as State Farm Mutual

37

undoubtedly did when it reconfigured SFG in 1998," and suggests the goal was "to evade effective rate regulation," not to manage risk. But regulation section 2644.20 did not require use of combined statements in 1998 (see discussion *post*), and CW does not explain how the reorganization was intended to avoid the regulation at the time. For similar reasons, we reject the Commissioner's conjecture that if we affirm the judgment, "large insurers can be expected to move their California policies to corporate entities that hold only low-yield investments." Appellants also note aspects of SFG's relationship with its affiliates, including the shared services, reinsurance, and liquidity pool. But, again, they identify no evidence of *asset* sharing since 1998, much less in a manner intended to avoid regulation.[18]

Appellants also do not establish that limiting rate manipulation was a purpose of Proposition 103. They cite its purpose section, which reflects it was meant to ensure fair and reasonable rates, and the Commissioner's broad discretion in adopting regulations to administer the initiative. But the initiative provided for the prior approval system, pursuant to which insurance companies can apply for rate changes and the Commissioner can review them—not the kind of open-ended enforcement power the Commissioner appears to be asserting.

Second, Appellants contend that using group-level data is more accurate and reliable, noting other aspects of insurance regulation use group data and most insurers pool income. With respect to group data, they

---

[18] The Commissioner does contend that because SFG's evidence was excluded, it has not proven there was no rate manipulation, and we lack the record to determine if there was. We reiterate our concern with Appellants' approach to the evidence in this appeal, and, either way, will not assume SFG manipulates rates because it allegedly has not shown otherwise.

contend risk management occurs on a group-wide basis and cite a Rate Order finding that focusing only on SFG "would not provide an accurate picture of the diversification of [its] investment risk . . . ." They also cite a finding by a rating organization that State Farm Group was "well diversified . . . ." But Appellants do not establish risk assessment and diversification are coextensive with income projection, and, regardless, section 1861.05(a) still requires use of the *insurance company*'s investment income.

As for those insurers that do pool income, their prevalence does not compel a different result. There is no dispute regulations are "not invalid merely because they are to some extent underinclusive or overinclusive," as the Commissioner asserts, but regulations still must be applied consistent with the authorizing statute. The cases the Commissioner cites are inapposite. (See *Warden v. State Bar* (1999) 21 Cal.4th 628, 633-634, 649, fn. 13 [rejecting argument that state bar MCLE exemptions violated equal protection, just because classifications might be imperfect]; *Agric. Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 410-411 [zoning plan is not "unconstitutional merely because certain property owners can show that it causes them unnecessary hardship"].)

Third, Appellants contend use of group-level data improves manageability, by eliminating disputes over whether entities should be treated as groups and avoiding the need to examine corporate affairs and transactions. But their preceding arguments reflect they contemplate few, if any, good faith disputes; they simply assume group treatment is always valid, and they have not established this. Their specific contentions also lack merit. They contend the NAIC set an "objective standard" for determining if affiliates are sufficiently related to file a combined statement, thus eliminating disputes about group treatment. The purpose of the NAIC form

39

is to provide "combined data . . . for use by the NAIC in statistical research and analysis." We are unconvinced that such a standard, objective or otherwise, can be dispositive of whether group assets reflect an "insurance company's investment income" under section 1861.05(a). Appellants also note the Commissioner may adopt regulations to "reduce the job to manageable size . . . ." (*Calfarm*, *supra*, 48 Cal.3d at p. 824.) But the purported manageability concern only arises from the unfounded assumption that group treatment is always valid. Finally, the Commissioner argues use of group data leaves insurers "free to structure their businesses and allocate investments between corporate entities in whatever ways they find prudent, without those internal corporate decisions affecting their California rates." Not so. Far from giving insurers flexibility, requisite use of group data could spur them to tailor their investment and business strategies—and to the detriment of consumers, as noted above.

3.    *Deference to Commissioner*

Appellants further contend we should also accept the Commissioner's interpretation and application of regulation section 2644.20, because significant deference is due to him. We agree with the superior court that deference is not warranted here.

a.    *Applicable Law*

Additional legal background is helpful. There are two categories of administrative rules, quasi-legislative and interpretive. (*Yamaha*, *supra*, 19 Cal.4th at p. 10.) A quasi-legislative rule "represents an authentic form of substantive lawmaking," in which the "agency has been delegated the Legislature's lawmaking power" and the scope of judicial review is narrow. (*Ibid*; *Id*. at pp. 10-11 [requiring quasi-legislative rules to come within designated authority, and be "reasonably necessary" to implement the

statutory purpose]; see *ASIC*, *supra*, 2 Cal.5th at pp. 396-397.) An interpretive rule "represents the agency's view of the statute's legal meaning and effect," and "commands a commensurably lesser degree of judicial deference." (*Yamaha*, at p. 11; *ASIC*, at p. 397 [court "must also consider whether the administrative interpretation is a proper construction of the statute"].)

There are "two broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation:  those 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' " (*Yamaha*, *supra*, 19 Cal.4th at p. 12; see *ASIC*, *supra*, 2 Cal.5th at p. 390.)

"In the first category are factors that 'assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.  A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Yamaha*, *supra*, 19 Cal.4th at p. 12.)

The "second group of factors . . . includes indications of careful consideration by senior agency officials . . . , evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' . . . , and indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha*, *supra*, 19 Cal.4th at pp. 12-13.)  Further, "[i]f an agency has adopted an interpretive rule in accordance with Administrative Procedure Act provisions—which include procedures (e.g., notice to the public

41

of the proposed rule and opportunity for public comment) that enhance the accuracy and reliability of the resulting administrative 'product'—that circumstance weighs in favor of judicial deference."[19] (*Id.* at p. 13.)

### b. *Analysis*

As an initial matter, Appellants contend regulation section 2644.20 warrants great deference "because it is a quasi-legislative rule . . . ." But, as discussed *ante*, the validity of regulation section 2644.20 is not at issue here. Rather, the issue is whether the Commissioner's *interpretation* of the regulation, as applied to SFG, is consistent with the statute, and we have concluded it is not. That lack of statutory consistency would render deference inappropriate, even if quasi-legislative principles applied. (See *Yamaha*, *supra*, 19 Cal.4th at p. 11, fn. 4 ["even quasi-legislative rules are reviewed independently for consistency with controlling law"]; *Quackenbush*, *supra*, 77 Cal.App.4th at p. 71, fn. 2 ["it is clear that the 'quasi-legislative' label does not insulate the Commissioner's legal determinations from the usual level of judicial scrutiny any more than it protects his factual determinations"].)

Turning to the factors impacting deference to agency interpretations, we begin first with agency expertise and knowledge. Although there is no

---

19  We disagree with CW that courts must defer to an interpretation involving an agency's "area of expertise" unless the " 'construction contradicts the clear language and purpose of the interpreted provision,' " for which it cites *Hoitt v. Dept. of Rehabilitation* (2012) 207 Cal.App.4th 513, 526. *Hoitt* is inapposite, and its view of the applicable legal standards has been rejected. (*Ibid.* [department properly interpreted regulations for vocational training reimbursement]; *United Artists Theatre Circuit, Inc. v. Cal. Regional Water Quality Control Bd.* (2019) 42 Cal.App.5th 851, 883-884 [rejecting similar language; "if taken literally," it would "almost always require deference to any agency interpretation of an ambiguous statute," which is "inconsistent with this court's 'ultimate responsibility for the construction of the statute' "].)

dispute regarding the Commissioner's expertise here, it is not dispositive. *Quackenbush* is instructive. There, the Court of Appeal declined to defer to the Commissioner's regulatory interpretation in affirming a mixed judgment that effectively precluded a rollback year refund. (*Quackenbush*, *supra*, 77 Cal.App.4th at pp. 69, 71-72; *ibid.* [addressing treatment of loss adjustment expenses under regulation section 2643.6].) The *Quackenbush* court acknowledged it "must respect the Commissioner's expertise," noting this was a *Yamaha* factor, but found the second group of factors were "less helpful" to the Commissioner. (*Quackenbush*, at p. 75; *id.* at pp. 75-76 [interpretation was not contemporaneous with regulation's enactment; this was "first contested case," so one could not say Commissioner "consistently maintained" the interpretation; and stance could be viewed as a litigation position entitled to "substantial weight, but limited deference"].)

Second, the Commissioner emphasizes regulation section 2644.20 was adopted "through a notice and comment procedure that mirrors the Administrative Procedure Act." But deference is warranted for formally adopted rules because, in theory, they "include[] indications of careful consideration by senior agency officials." (*Yamaha*, *supra*, 19 Cal.4th at p. 13; *ibid.* [" 'an interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member' "].)

Appellants identify nothing in the 2007 regulation revision process reflecting careful consideration of the disputed "consolidated statutory annual statement" language. Indeed, neither the Notice of Proposed Rulemaking nor Final Statement of Reasons discuss this language specifically, even though they do generally address changes to projected yield, including the use of the insurer's actual portfolio. And when a public

commentator suggested consolidated statement data might be inappropriate in certain situations, the Commissioner simply referred the commentator to "other comments in this rulemaking file regarding use of combined data"— none of which addressed consolidated statements.[20]  For analogous reasons, we agree with SFG that the Commissioner's effective disregard for the "actual portfolio" language in his regulatory interpretation arguments likewise does not "reflect the type of 'thoroughness . . .' and 'validity of . . . reasoning' that supports judicial deference."  (*Yamaha*, *supra*, 19 Cal.4th at p. 14.)

*PacifiCare Life & Health Ins. Co. v. Jones* (2018) 27 Cal.App.5th 391, cited by the Commissioner, does not aid Appellants.  In rejecting a facial challenge to a regulation under the Unfair Insurance Practices Act, the court there noted the Commissioner engaged in a formal rulemaking process and this "careful consideration," along with his expertise, supported deference.  (*Id.* at p. 417.)  The present case involves application of a regulation, and there is no indication of careful consideration of the language at issue.  (Cf. *Spanish Speaking Citizens*, *supra*, 85 Cal.App.4th at pp. 1186, 1195, 1198 [regulations regarding automobile insurance rating factors were "adopted after years of study and debate," including appointment of an "actuarial advisory committee" and release of an 18-month impact analysis].)

---

[20]  The commentator's specific concern was that "use of consolidated Annual Statement data is inappropriate where companies not admitted in California are included," and "[i]f the non-admitted company writes a different mix of business from the admitted insurer, they will have a very differently distributed portfolio and the duration of the invested assets is likely to be different."  We grant SFG's request for judicial notice of administrative materials regarding the Proposition 103 regulations.  (Evid. Code, §§ 452, subd. (c), 459.)

44

Third, Appellants argue the Commissioner has consistently applied the current version of the regulation since its adoption in 2007, and SFG has identified no evidence of inconsistent treatment. The Commissioner also notes he is required to use a "single, consistent methodology," and maintains he does so. (See Reg. § 2643.1 ["While companies remain free to formulate their rates under any methodology, the Commissioner's review of those rates must use a single, consistent methodology."].) But SFG *has* noted different treatment, for insurers without affiliates, and the Commissioner has acknowledged as much. Further, the present matter appears to be the first contested adjudication of the regulatory language at issue, casting doubt on the Commissioner's ability to claim "consistent interpretation" at all. (See *Quackenbush, supra*, 77 Cal.App.4th at p. 76 ["Since . . . this is the first contested case to test the requirements of [regulation] section 2643.6, it cannot be said that the Commissioner had consistently maintained his interpretation."].)[21]

Moreover, our starting point is not 2007. The Commissioner first issued regulations under Proposition 103 in 1991, and between a minor revision the following year and 2007, projected yield was calculated using "imbedded yield" based on the insurer's "net investment income"—with no reference to a "consolidated statutory annual statement." (Register 92, No. 3,

---

[21] We reject CW's claim that SFG previously admitted the Commissioner interpreted the regulation consistently. It cites a superior court brief in which SFG said it filed this case after "years of accepting the Commissioner's interpretations in order to gain rate approvals without having to go to hearing." SFG's point appeared to be that it had *avoided* taking a position on the Commissioner's view at all, to expedite rate approvals.

p. 728.30; Register 92, Nos. 15-17, p. 728.32].)[22] The 2007 rulemaking file generally addressed reasons for the change, as noted above. But the point is there *was* a change, which not only underscores the lack of consistent application, but also reflects a lack of contemporaneous enactment. (Cf. *Yamaha*, *supra*, 19 Cal.4th at p. 13 [factors for deference include whether interpretation was "contemporaneous with legislative enactment of the statute being interpreted"].) Accordingly, we also reject any reliance by Appellants here on the Supreme Court's approval of the Proposition 103 regulatory framework in *20th Century*, as the disputed regulatory language was not in effect at the time.[23]

D.  *Conclusion*

Having determined the Commissioner's interpretation and application of regulation section 2644.20 is inconsistent with Insurance Code section 1861.05(a), notwithstanding applicable principles of deference, we agree the superior court properly required the Rate Order to be set aside.

---

[22]  The net investment income calculation called for "excluding capital gains, [and] divid[ing] by the average of the insurer's . . . surplus and reserves." (Former Cal. Code Regs., tit. 10, § 2644.20(a); Register 92, Nos. 15-17, p. 728.32.)

[23]  SFG directs us to additional administrative materials that reflect an early focus on individual insurers, which it contends further illustrate the Commissioner's position has vacillated. Although we already concluded as much, at least some of the materials are consistent with that conclusion. (See, e.g., Commissioner letter to Office of Admin. Law, 1992 [addressing importance of § 1861.05(a), and explaining a "crucial aspect" of ratemaking is that the insurers have use of the premiums]; Reg. § 2646.4 [titled "Hearings on Individual Insurers' Rates" since Register 92, No. 3].)

II.    *Retroactive Rate and Refund, and Cross-Appeal From Remand Order*

We now turn to the errors urged by SFG:  that the Commissioner erred in ordering a retroactive rate and refund, and that the superior court erred in ordering a remand.[24]  We agree with SFG in both respects.

A.    *Commissioner's Retroactive Rate Order*

SFG argues that under the prior approval system, it was required to pay the approved rate pending approval of a new one, thus precluding retroactive rates and related refunds.  Appellants maintain the rate was not impermissibly retroactive, and the refund was proper regardless.  We conclude the statutory prior approval requirement is prospective in operation and inconsistent with retroactive rates and refunds.

1.    *Applicable Law*

"[S]tatutes ordinarily are interpreted as operating prospectively in the absence of a clear indication of a contrary legislative intent."  (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 955 (*Quarry*).)

"In deciding whether the application of a law is prospective or retroactive, we look to function, not form. . . .  Does the law 'change[ ] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct?'  [Citation.]  Does it 'substantially affect [ ] existing rights and obligations?'  [Citation.]  If so, then application to a trial of preenactment conduct is forbidden, absent an express legislative intent to permit such retroactive application.  If not, then application to a trial of

_____

24    As noted, the superior court did not reach the retroactive rate and refund issues, but the Commissioner agrees we should do so and CW impliedly agrees by acknowledging their relevance to remand.  SFG appears to treat these issues both as further reason to affirm set aside of the Rate Order, and an argument against remand, thus implicating the appeal and cross-appeal.  We group them with the cross-appeal for clarity.

47

preenactment conduct is permitted, because the application is prospective." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 936-937; see *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 280 [retroactive law increases "liability for past conduct"]; see, e.g., *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231-232 [retroactive rules included "subject[ing] tobacco sellers to tort liability for acts performed" when "protect[ed] [by] an immunity statute," while prospective rules included eliminating right under anti-SLAPP to "dismiss certain public-interest lawsuits"].)

"[T]he presumption that legislation operates prospectively rather than retroactively is rooted in constitutional principles." (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841; see *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475 ["[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly"].)

"Ambiguous statutory language will not suffice to dispel the presumption against retroactivity; rather ' "a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective." ' " (*Quarry*, *supra*, 53 Cal.4th at p. 955.)

2.    *Analysis*

a.    *Statutory Language*

The prior approval requirement is set forth in section 1861.01, subdivision (c), and it is brief:  "Commencing November 8, 1989, insurance rates subject to this chapter must be approved by the commissioner prior to their use."  The plain language of the statute thus requires that rates be set before their use, and apply prospectively.

We disagree with Appellants that language in section 1861.05(a)—"[n]o rate shall be approved or remain in effect"—supports a different reading.

Construed in context, this language simply reflects that when a rate is reviewed and does not satisfy prior approval requirements (such as by being excessive), it will not go into effect or will no longer stay in effect. This is consistent with section 1861.01, subdivision (c)'s prospective orientation. Appellants' suggestion that the terms "approved" and "remain in effect" represent prospective and retrospective options is not consistent with that orientation, and lacks merit regardless. Even if the interpretation were reasonable, it would simply render the phrase ambiguous and that is insufficient for retroactive application. (*Quarry*, *supra*, 53 Cal.4th at p. 955.)

b.      *Statutory Scheme*

Prospective application of prior approved rates also is consistent with the distinction between the prior approval period and the rollback year, which did incorporate retroactive refunds.

As the California Supreme Court explained in *20th Century*, the rollback year was a "temporary regulatory regime . . . evidently designed to allow the setting up of a permanent regulatory regime to follow . . . ." (*20th Century*, *supra*, 8 Cal.4th at p. 243.) The Court emphasized, "So far as the ratemaking formula functions in the rate rollback, . . . it has nothing to do with the 'prior approval' system. . . . That the two regimes are distinct is apparent in Proposition 103. It remains such in our construction of the initiative in *Calfarm*." (*20th Century*, at pp. 288-289.)

During the rollback year, an insurer who felt the 20 percent rollback was confiscatory could apply for higher rates and start charging them, but if the Commissioner later determined they were excessive, the insurer "had to refund with interest any premiums collected in excess of the rates ultimately approved." (*Calfarm*, *supra*, 48 Cal.3d at p. 815; *id.* at p. 825 [elaborating that if application were filed during rollback, insurer could "begin charging

49

that higher rate pending approval," while after that period, rates "must be approved by the commissioner prior to their use, but . . . the commissioner can approve an interim rate pending her final decision"; "[i]f the commissioner finds the initiative's rate, or some other rate less than the insurer charged, is fair and reasonable, the insurer must refund excess premiums . . . with interest"].)  The rollback regulations addressed refunds. (Reg. § 2645.3 [to "extent that the rates charged during the rollback period exceeded the minimum permitted earned premium, the excess shall be refunded to consumers with interest"]; Reg. § 2645.9 [amount of refund].)  Refunds thus served a function during the rollback year:  facilitating the temporary system in which insurers could charge non-approved rates pending approval.  (See *20th Century*, *supra*, 8 Cal.4th at p. 283 [insurers "were on notice that, in charging a higher rate [than the statutory rollback rate], they were proceeding at their own risk:  they had to establish their entitlement to that rate"].)

In contrast, the prior approval system requires insurers to charge prior approved rates, pending approval of new ones, so there is no comparable role for refunds.  (§ 1861.01, subd. (c); *Calfarm*, *supra*, 48 Cal.3d at p. 825, fn. 17.)  Nor do the regulations applicable to the prior approval system address refunds, in contrast to the rollback regulations.  (See Ch. 5, subchapter 4.8 generally, including article 6 [Procedures for Determination of Rates].)

We reject Appellants' suggestion that *Calfarm* and *20th Century* support the use of refunds generally under Proposition 103.  Those decisions concerned the substantive rate rollback, and the rollback regulations, respectively, and the Court took care to distinguish the prior approval period as a separate regime.  (*Calfarm*, *supra*, 48 Cal.3d at p. 825 and fn. 17; *20th Century*, *supra*, 8 Cal.4th at pp. 242-243, 288-289.)  *Mercury*, cited by

50

Appellants, did not involve refunds and is otherwise distinguishable. (*Mercury*, *supra*, 8 Cal.App.5th at p. 589 [rejecting attempt to limit *20th Century*'s "deep financial hardship" test for confiscation to rollback period, noting "[n]othing in the Supreme Court's extended discussion . . . suggests that it would apply only to a retrospective price control rather than a prospective price control"].)

>              c.      *Case Law from Other Contexts*

We agree with SFG that authority from other contexts supports the conclusion that the retroactive rate and refund were impermissible. For example, in *Bowen v. Georgetown University Hospital* (1988) 488 U.S. 204 (*Bowen*), the United States Supreme Court held the Secretary of Health and Human Services had no authority to issue retroactive Medicare cost-limit rules that required providers to return sums. (*Id.* at pp. 208-216.) The Court stated that "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." (*Id.* at pp. 208-209.) A rule against retroactive ratemaking in California's public utility setting similarly "prevents [a regulator] from forcing a [regulated entity] to disgorge the proceeds of rates that have been finally approved and collected." (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 62; see, e.g., *Pacific Tel. & Tel. Co. v. Public Utilities Com.* (1965) 62 Cal.2d 634, 649-650 [accord; striking refund order issued at end of rate investigation, for period of investigation].) We recognize these are different statutory and regulatory schemes, but other statutes can be instructive and these serve that role here. (See, e.g., *Calfarm*, *supra*, 48 Cal.3d at p. 825, fn. 16 [noting "analogous area of public utility regulation"].)

SFG also directs us to cases addressing the exclusivity of California rate approval proceedings, in which the courts reasoned, in part, that insurers are *required* to charge approved rates. (See *Walker v. Allstate Indem. Co.* (2000) 77 Cal.App.4th 750, 753 ["Once the commissioner's decision is final, an insurer must charge only the approved rate"]; *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427, 1431 [casualty insurer "cannot charge a rate unless the rate is part of a rate plan which has been approved in advance"]; *MacKay*, at p. 1435, fn. 6 ["[a]n approved rate has the imprimatur of the [Department]; it has been approved as compliant with the law, to the best of the [Department]'s determination."].) Contrary to Appellants' assertion, the significance of this reasoning is not diminished just because these cases arise in a different legal context or because that context continues to evolve. (See *Villanueva v. Fidelity National Title Co.* (2021) 11 Cal.5th 104, 110-111 [Commissioner did not have exclusive jurisdiction over claim that title insurer charged unauthorized rate].)

d.   *Appellants' Remaining Arguments*

Appellants' remaining arguments lack merit. First, we reject their reliance on the California Supreme Court's observation in *Calfarm* that the Commissioner's "power to grant interim relief . . . may fairly be implied" from the "remain in effect" language. (*Calfarm*, *supra*, 48 Cal.3d at p. 825.) The Court was addressing the rollback period, and specifically insurers' ability to obtain relief for potentially confiscatory rates. (*Ibid*.) The "remain in effect" language could reasonably have a different interpretation in that context, where there were rates in use that had not yet been approved. Although the Court did allude to the possibility of interim relief in the prior approval period, it did so in terms of "interim rates" (*Ibid.*)—implying the use of a temporary *rate*, not, as we discuss *post*, mere notice that a refund might be

52

imposed in some amount (much less the "immediate[] reduct[ion]" the Commissioner now claims he could impose).

Second, Appellants contend the refund actually was *prospective*, citing a discussion from *20th Century*. That discussion, like the rest of the case, concerns the rollback period, and does not apply here. We explain. The Court observed that "rate regulations as to rollbacks may properly be considered prospective," stating, in part: "The ordering of a refund of rates is 'akin to a reduction in rates,' when, as here, *the rates in question were charged 'pending a determination of [their] legality . . . .'* [Citations.] It follows that the ordering of a refund of rates is itself prospective." (*20th Century*, *supra*, 8 Cal.4th at 281, italics added.) In the prior approval system, rates are not "pending a determination of . . . legality." They have been approved.

The Court then noted that even if the rollback regulations "might be deemed 'retroactive,' they cannot be deemed impermissibly so"—contrasting "primary retroactivity," which impacts "past legal consequences of past actions," with " '[s]econdary' retroactivity," when regulations "affect[] the future legal consequences of past transactions . . . ." (*20th Century*, *supra*, 8 Cal.4th at p. 281.) It found secondary retroactivity was present, but this was "an entirely lawful consequence of much agency rulemaking and does not by itself render a rule invalid." (*Id.* at p. 282.) But rollback year refunds could be viewed as impacting future legal consequences, because the rates were not approved yet. In contrast, a refund order as to an approved rate would impact *existing* legal consequences. (See *Bowen*, *supra*, 488 U.S. at pp. 219-220 (conc. opn. of Scalia, J.) [providing examples; primary retroactivity includes change to "reimbursement . . . for already-provided Medicare services" and attempt to "recoup . . . funds" paid to hospitals, and secondary

53

retroactivity includes rule "that for . . . future income tax liability" treats previously nontaxable trusts as taxable, "rendering the previously established trusts less desirable in the future"].)[25]

Third, Appellants cite the Werner ratemaking treatise to contend ratemaking is prospective when, as here, it is based on "past experience to estimate the premium needed for a prospective policy period," whereas it would be retrospective if based on "actual experience during the policy period." But the treatise focuses on ratemaking methodology generally, not retroactivity under California law. And, regardless, both prospective and retroactive ratemaking use data; the difference is what the data is used *for*. (See *20th Century*, *supra*, 8 Cal.4th at p. 252 ["Because the 'prior approval' system concerns rates for the future, its orientation is necessarily prospective. Hence, for review of rates thereunder, the ratemaking formula relies much on projections. [Citations.] [¶] By contrast, because the rate rollback concerns rates for a period that has passed, its orientation is retrospective. Hence, for review of rates thereunder, the ratemaking formula relies much on actual historical data."].) To the extent the Commissioner

_____

[25] We recognize the California Supreme Court distinguished *Bowen* in addressing the rollback year in *20th Century*, but it expressed no opinion on its application to the prior approval system. (*20th Century*, *supra*, 8 Cal.4th at p. 282 [rejecting reliance on *Bowen* to argue rollback regulations were impermissibly retroactive, explaining the "Medicare cost-limit regulations" there " 'alt[ered] the past legal consequences of past actions' under predecessor regulations"].) The Commissioner relatedly contends the Rate Order did not change the legal consequences of past conduct because regulation section 2644.20 has been in effect since 2007. He conflates the propriety of the order with its timing; SFG's objection here is not to the rate determination itself, but to the effective date and refund.

used past data to impose a rate for a "period that has passed"—as he did here—the resulting order is retroactive. (*Ibid.*)

Finally, Appellants contend the Notice of Hearing, issued June 22, 2015, "provisionally advis[ed] [SFG] that its existing rates were excessive, and that it could be required to issue refunds on excess premiums collected after July 15, 2015." The Commissioner contends, in turn, that SFG had options besides charging the prior approved rates during the rate hearing, including "approaching [him] for an interim rate order" that was consistent with the Notice of Hearing and stipulating to a lower rate. These arguments lack merit. The issue is not that SFG was unaware the Commissioner might order a refund; that much was plain from the notice (even if it was vague as to how much of a refund might be due). The issue is that SFG was required and entitled to charge the approved rate, until a different rate was approved. The purported alternatives would have forced SFG to concede the Commissioner's position, at least during the hearing, and to forego the difference in premiums if SFG turned out to be correct. Nor do we find it relevant that SFG identified the July 15, 2015 date in its application, as CW notes. SFG unsuccessfully tried to update the date later, and it has consistently disputed the validity of a retroactive rate and refund.

The cases cited by the Commissioner are of no assistance. In *In re Marriage of Economou* (1990) 224 Cal.App.3d 1466, the Court of Appeal affirmed an order requiring the husband to pay retroactive support, based on his fraudulent conduct. (*Id.* at p. 1477.) The court explained child support can be retroactive and spousal support is subject to modification, citing applicable statutes, and the family court had given notice retroactivity might be considered. (*Id.* at pp. 1477-1478.) Here, there is no legal basis for a retroactive refund in the first place. *Pitts v. Perluss* (1962) 58 Cal.2d 824 is

likewise distinguishable. (*Id.* at pp. 827-828, 835 [regulation for unemployment compensation disability insurance not retroactive simply because it impacted existing plans; expressly noting no penalty "attaches to any past act" and companies just had to "discontinue . . . noncomplying plans or establish complying ones"].)[26]

## B. *Superior Court's Remand Order*

In its cross-appeal, SFG argues the superior court erred by remanding to the Commissioner, as there is nothing left for him to determine. We agree.

### 1. *Additional Facts*

In March 2018, the superior court entered its minute order setting aside the rate determination and remanding for further proceedings, including on the retroactive rate and refund issue. In May 2018, the Commissioner approved SFG's application for a new rate, set to take effect on July 15, 2018. That July, SFG moved for reconsideration of the remand order under Code of Civil Procedure section 1008, subdivision (b), which the court denied on timeliness and other grounds. The court's writ of mandate, issued with the judgment in February 2019, continued to direct the Commissioner to reconsider remanded issues.

---

[26] We briefly address two remaining points. First, we reject the Commissioner's analogy to the judicial power to preserve the status quo pending decision; the issue is what he ordered *after* the rate hearing, not during it, and the case he cites is inapposite. (Cf. *People ex rel. San Francisco Bay Conservation and Development Com. v. Emeryville* (1968) 69 Cal.2d 533, 538 [deletion of procedural language from constitution did not limit Court's inherent power to preserve jurisdiction with writ of supersedeas].) Second, SFG initially cited sections 1858.1 to 1858.3, and 1858.6, but withdrew its reliance on the former and did not discuss the latter in its reply brief. We need not address them.

2.    *Analysis*

As a preliminary matter, it is unnecessary to resolve SFG's argument that the superior court erred by denying its reconsideration motion. CW states the issue is irrelevant (while maintaining the court did not err), explaining remand can only be denied if the Commissioner lacked authority to set a retroactive rate. The Commissioner does not substantively address the reconsideration motion at all. We conclude the need for remand, if any, is independent of the reconsideration motion, and the record reflects no such need exists here.

The propriety of administrative proceedings on remand turns on whether anything remains for determination by the agency. (See *Tripp v. Swoap* (1976) 17 Cal.3d 671, 677 [no need for remand regarding disability benefits, as there "was no issue remaining on which the trial court could invade the director's discretion"], overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180; *Ross Gen. Hosp., Inc. v. Lackner* (1978) 83 Cal.App.3d 346, 354 [concluding hospital facility regulation was invalid as applied and directing department to issue certificate of exemption to hospital; when administrative record "requires as a matter of law that a particular determination be made, the court may order that the agency carry out its legal obligation"].)[27]

---

[27]    (See *In re Martinez* (2012) 210 Cal.App.4th 800, 827 [" 'It is indeed a well-established principle of administrative law that an administrative agency vested with discretion to make a certain decision in the first instance may have its discretion limited on remand or even eliminated entirely by a reviewing court' "], citing *In re Prather* (2010) 50 Cal.4th 238, 259 (conc. opn. of Moreno, J.); cf. *People v. Coelho* (2001) 89 Cal.App.4th 861, 889 ["reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance"].)

Here, remand is unnecessary because no further rate determination is needed. There are three time periods: (i) from July 15, 2015, the rate commencement date under the Rate Order, through December 8, 2016, the date the Rate Order became effective; (ii) between December 8, 2016 and July 15, 2018, the date SFG's newly approved rate took effect, during which SFG charged rates consistent with the Rate Order; and (iii) after July 15, 2018. For the first period, we concluded above that the retroactive rate and related refund were invalid, obviating the need for recalculation. For the second period, SFG represents it cannot recover amounts lost due to applying the reduced rates, so there is also no need for recalculation. For the third period, SFG had obtained a rate increase in 2018, so there is nothing to recalculate there, either.

Appellants' arguments for remand are not persuasive. First, they argue remand is needed so the Commissioner can determine a rate and refund amount for the first period. This argument falls with our determination that the retroactive rate and refund were impermissible. Second, the Commissioner cites Code of Civil Procedure section 1094.5, which applies to administrative mandate matters, and argues the judgment "shall not limit or control in any way the discretion legally vested in the respondent." (§ 1094.5, subd. (f).) No such limit is at issue here, because there is no discretion left to exercise. (Cf. *Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1355 [rejecting argument in zoning dispute that trial court erred by ordering city to revoke permits, rather than remanding; explaining there was "no discretion involved in the application of the formula to the measurements at issue" under the zoning ordinance].) Finally, the Commissioner states he designated the Rate Order as precedential, he "must . . . determine what to do" with it, and the "answer may not be as simple as

58

merely setting it aside." He notes SFG did not challenge some issues and chose not to keep pursuing others, citing the catastrophe adjustment factor and leverage factor variance, respectively. But he does not argue these or any other issues *should* be precedential; instead, he summarily asserts he "needs to determine" this, without elaboration or authority. We are not persuaded.

## DISPOSITION

The judgment is affirmed as to the superior court's ruling that the Commissioner's rate determination must be set aside. The judgment is reversed to the extent the superior court remanded to the Commissioner for further proceedings. The superior court is directed to enter a new and different judgment: (i) granting SFG's petition for writ of administrative mandate; and (ii) directing the Commissioner to set aside the Rate Order in its entirety. SFG shall be awarded its costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

GUERRERO, J.

DO, J.

59